ORDERED in the Southern District of Florida on   NOV 2 2 2011





John K. Olson, Judge
**United States Bankruptcy Court**

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
### Fort Lauderdale Division
### www.flsb.uscourts.gov

In re:

      **DANIELLE SUZANNE LOPATA,**

          Debtor.

_____/

Case No. 10-31166-JKO

Chapter 7

      **GBP REALTY ASSOCIATES, INC. d/b/a**
      **TURNBERRY INTERNATIONAL REALTY**

          Plaintiff,

          vs.

      **DANIELLE SUZANNE LOPATA,**
          Defendant.

_____/

Adv. No. 11-01665-JKO

Chapter 7

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This adversary proceeding arose out of an individual petition for relief under Chapter 7,

Title 11 of the United States Code filed by the Debtor, Danielle Suzanne Lopata, on July 23,

1

2010. Creditor GBP Realty Associates, Inc. ("GBP") thereafter commenced its adversary proceeding objecting to the Debtor's discharge pursuant to 11 U.S.C. §727(a)(3) and (a)(4)(A) on January 31, 2011. A trial was held on September 21, 2011, at which the Debtor was the sole witness to testify. After having had an opportunity to observe Debtor's demeanor during her testimony at trial and review GBP's trial exhibits, this Court makes the following findings of fact and conclusions of law.

## Findings of Fact

### Debtor's Schedules, SOFA, and Form B22A

1. The Chapter 7 Trustee assigned to Debtor's bankruptcy filing, Sonya Salkin, filed a report of no distribution on September 1, 2010 reflecting that no assets were available to provide a distribution to creditors of the Debtor's bankruptcy estate. [Case No. 10-31166, ECF No. 17]. The Trustee's determination in this regard appears to be based, at least in part, upon Debtor's schedules ("Schedules"), Statement of Financial Affairs ("SOFA") and Statement of Current Monthly Income and Means Test Calculation ("Form B22A") filed in conjunction with Debtor's petition.

2. At trial, Debtor's Schedules and SOFA were admitted to evidence as Plaintiff's Exhibit ("P.E.") 14. Debtor's Schedule B assigns, under item 13, a valuation of "0.00" to her 100% ownership interest in The Sports Book, Inc. ("TSB"). Debtor explained at trial that TSB is in the business of providing models to production companies and casting directors for modeling shoots. (Trial Transcript ("T") p.15:15-25; p.16:1-9).

3. Debtor's Schedule D reflects, *inter alia*, secured debt for a first mortgage encumbering Debtor's homestead condominium unit as well as an automobile lien on a

2

Mercedes (hereinafter referred to as the "Mercedes"). At trial, Debtor testified the Mercedes had been surrendered to the lienholder. (T.p.100:16-25; p.101:1).

4.      Debtor's Schedule F includes unsecured debts in favor of American Express and Barclays Bank of Delaware, both of which pertain to credit cards held in Debtor's name, individually. (T.p.56:25; p.57:1-15; p.63:9-23).

5.      Debtor's Schedule I lists Debtor's occupation as "Owner of Modeling Agency" and TSB is listed as her employer. Debtor's employment with TSB is listed as spanning a period of more than thirteen years. Debtor indicated "0.00," without exception, in response to each and every item listed on Schedule I, thereby indicating Debtor earned no current monthly income whatsoever.

6.      Debtor's Schedule J lists various current monthly expenditures, including: $620.00 towards Debtor's home mortgage; $95.00 towards electricity and heating fuel; and over $700.00 towards Home Owner's Associations, which, as Debtor explained at trial, pertain to her monthly condominium association maintenance assessments. (T.p.102:1-13). In total, Debtor's Schedule J indicates a monthly net income of negative $2036.54 based upon all of the monthly expenditures listed, coupled with zero monthly income.

7.      SOFA question 1 seeks disclosure of "the gross amount of income the debtor has received from employment, trade, or profession, or from operation of the debtor's business . . . from the beginning of this calendar year to the date this case was commended." Instead of listing gross amounts from "the beginning of this calendar year to the date this case was commenced," Debtor appears to have listed totals for gross income as set forth in her individual tax returns from 2007-2009. *See also* (P.E. 1) (consisting of Debtor's individual tax returns for such years with corresponding amounts therein indicated for gross income).

3

8.    SOFA question 2 seeks disclosure of income other than from employment or operation of business. Debtor checked the box marked "None" in response to question 2.

9.    Debtor's Form B22A was admitted to evidence at trial as P.E. 15. Part II of Form B22A explains: "All figures must reflect average monthly income received from all sources, derived during the six calendar months prior to filing the bankruptcy case, ending on the last day of the month before the filing." In Debtor's Form B22A, Debtor indicated "0.00" for all entries of Part II – including both items 8 [1] and 10 [2]. Debtor's Form B22A thus yields a "Total Current Monthly Income for § 707(b)(7)" of "0.00," indicating Debtor received no income during the six calendar months prior to filing her bankruptcy case.

10.    Declaration clauses follow Debtor's Schedules, SOFA, and Form B22A in which Debtor verified, under penalty of perjury, that all of the information contained in those documents is true and correct.

*Debtor's Testimony at Trial*

11.    At the September 21, 2011 trial, GBP called Debtor as its sole witness. Debtor is a licensed realtor and was formerly a sales associate for GBP. (T.p.14:15-21).   In addition to actively maintaining her real estate license, Debtor works as a modeling agent through TSB (T.p.15:5-6), which was incorporated by Debtor in 1997 (T.p.15:12-14). TSB has no employees and Debtor is the sole officer, director and shareholder of the corporation. (T.p.17:22-25; p.18:1-5).

12.    In the ordinary course of business, TSB receives payments from clients in exchange for providing models for photo shoots. (T.p.15:18-25; p.16:1-17).   TSB then pays a

---

[1] Item 8 reads, in pertinent part: "Any amounts paid by another person or entity, on a regular basis, for the household expenses of the debtor or the debtor's dependents, including child support paid for that purpose."
[2] Item 10 reads, in pertinent part: "Income from all other sources."

4

portion of its earnings from a particular project to the model(s) involved, with the remainder retained by TSB as a commission. (T.p.18:6-22). Debtor testified that TSB would utilize its retained commission to "[p]ay operating expenses, pay whatever other expenses that it had." (T.p.18:23-25; p.19:1). Expenses include postage, photography fees, and "any kind of overhead relating to models and trying to get the clients to book them." (T.p.19:2-8).

13.     Debtor further explained that she derives no income from her operation of TSB, thereby reaffirming her indication of "0.00" on line 7 of Debtor's Schedule I. (T.p.21:13-24). Debtor also testified that she receives no support payments, thereby reaffirming her indication of "0.00" on line 10 of Debtor's Schedule I. (T.p.21:25; p.22:1-6). When questioned as to her amended Schedule J, Debtor testified she spent no money whatsoever towards the business expenses of TSB during the six-month period preceding the petition date. (T.p.23:5-15).

14.     Question 1 of Debtor's SOFA lists $1,442.00 for gross income as listed on Debtor's 2009 IRS Tax Return. When questioned about her SOFA at trial, Debtor was unable to explain where this $1,442.00 came from (T.p.24:11; p.25:1-6); however, Debtor testified that whatever the source of the 2009 income, it was absolutely not earned through or otherwise obtained from TSB (T.p.25:11-18).

15.     Debtor's 2009 tax return provides in schedule E, an adjusted gross income of $2,096.00 earned from TSB. Therefore, Debtor's 2009 tax return evidences that her stated earnings for that year did in fact originate, at least in part, from TSB – a result directly contrary to Debtor's testimony.

16.     Question 1 of Debtor's SOFA also lists "$-16,626.00" for gross income as listed on Debtor's 2008 IRS Tax Return. At trial, Debtor was unable to offer any explanation for this negative amount. (T.p.25:19-25; p.26:1-10).

17.     Debtor also testified that she loaned money to TSB "[f]rom its inception, always." (T.p.27:5-6). According to Debtor, TSB would use the loans to pay for "utilities, . . . whatever overhead expenses, if there were any, if a model needed to be paid, anything, whatever expenses that had occurred." (T.p.39:8-16). Debtor further testified that such loans extended throughout the six-month period preceding her bankruptcy filing. (T.p.28:4-15). Debtor confirmed at trial that she did not reflect these expenditures on her Schedule J (T.p.28:4-15) and denied that TSB paid any of her individual expenses (T.p.39:25; p.40:1-6).

18.     Debtor's responses to GBP's interrogatories were admitted to evidence at trial as P.E. 13. When questioned about her responses, Debtor testified that TSB generated over $32,000.00 in gross income between January 1, 2010 and July 23, 2010. (T.p.34:6-24). Debtor further explained that when TSB's gross receipts exceeded its necessary business expenses, she would be entitled to receive the overage in the form of a "bonus" at the end of the year. (T.p.36:14-25; p.37:1-6). Debtor added, however, that TSB's business was so bad there was no available profit and that she has "not received a check or a payment from TSB in years." (T.p.37:7-13).

19.     Debtor's trial testimony thus reflects that none of TSB's gross income or its business expenses for 2010 – *e.g.*, the $32,000.00 mentioned in Debtor's responses to GBP's interrogatories – was listed on Debtor's Form B22A because TSB's expenses exceeded its income (T.p.38:3-7) and Debtor "didn't receive a dime of that money." (T.p.38:8-10).

20.     Debtor testified that she maintains a single TSB checking account (T.p.42:6-10), that she acts as the sole bookkeeper for TSB (T.p.44:15-23), and that all of TSB's records and books are maintained by hand (T.p.44:15-23). Debtor explained that she refers to TSB's bank statements – copies of which were admitted into evidence as P.E. 6 – and check register to

6

maintain TSB's records. (T.p.45:1-3). Debtor keeps notes in the check register as to monies coming into and going out of the account. (T.p.45:1-3).

21.     On November 5, 2010, Debtor submitted to a Rule 2004 examination. At this examination, Debtor had difficulty answering basic questions regarding deposits to and withdrawals from TSB's corporate account. (T.p.40:7-25; p.41:1-24).

22.     At trial, Debtor explained that TSB's bank statements reflect merely dates and amounts of deposits to and withdrawals from the account, without specifying the source of the deposits or what happened to the funds withdrawn. (T.p.44:5-12). When asked whether TSB's check register would provide greater detail, Debtor testified the check register would allow her to ascertain additional information regarding the basis for deposits to and withdrawals from the TSB bank account.

23.     Debtor was deposed in November 2010. When questioned at trial as to whether she had produced TSB's check register in advance of her deposition, Debtor eventually testified that she could not recall – despite stating initially that all books and records of TSB had been produced in advance thereof. (T.p.41:14-19; p.46:14-25; p.47:1-5).

24.     Debtor was unable to recall at both her November 2010 deposition and at trial, when TSB last received a payment from a client. (T.p.51:10-25; p.52:1-25; p.53:1-24). Deposition testimony reviewed at trial evidenced Debtor didn't know or was unable to recall specifics as to deposits to and withdrawals from TSB's corporate account on no less than fifteen occasions (T.p.43:1-10; p.46:14-23; p.48:3-6; p.49:2-12; p.50:9-18; p.55:1-22; p.56:12-20; p.60:2-16).

25.     P.E. 17 is a transcript from GBP's continuation of Debtor's Rule 2004 examination, which took place on July 29, 2011. At trial, Debtor could not recall when she first

produced TSB's check register; however, Debtor's counsel stipulated on the record during the July 29, 2011 continuation, that the check register was not produced until the first week of July. (P.E. 17, p.113:25; p.114:1-5); (T.p.73:1-12). Further, Debtor explained during her continued Rule 2004 examination that she was unable to find the check register prior to her November 2010 deposition but she finally located it in June of 2011. (P.E. 17; p.111:3-20).

26. At trial, TSB's check register was admitted into evidence as P.E. 7. Despite creating the check register record [3] and explaining it is her only means of reconstructing the sources and destinations of deposits to and withdrawals from TSB's account, Debtor had difficulty at trial ascertaining the meaning of various entries. Specifically, Debtor was initially unable to explain a negative entry in the register under check number 3512, which reflected "-3000.00" next to the initials "DSL." (T.p.90:12-20; p.94:18-23). Ultimately, however, Debtor conceded under direct examination by GBP that the amount in question reflected a payment from TSB to her individually. (T.p.95:11-18). Collectively, the evidence produced at trial established TSB paid a total of more than $13,000.00 directly to the Debtor between July 2008 and the petition date. (T.p.90-p.100:1-2).

27. The check register also reflects that additional payments were made directly to expenses which are individual to the Debtor. These individual expenses include Debtor's: American Express card (T.p.56:12-25; p.57:1-9), Mercedes (T.p.100:16-23), condominium maintenance assessments (T.p.101:23-25; p.102:1-13), Barclay Bank credit card (T.p.63:3-23), home FPL account (T.p.112:9-24), and condominium mortgage (T.p.117:2-8). In fact, evidence introduced at trial established that between July 2008 and the petition date, TSB paid a total of more than $70,000.00 towards expenses individual to the Debtor. (T.p.100:3- p.119:16).

---

[3] As repeatedly established by counsel for GBP at trial, Debtor was TSB's sole bookkeeper and the check register was drafted exclusively by her. (T.p.95:2-6).

28. Moreover, the check register reflects substantial monies paid by Debtor directly to TSB. Specifically, evidence at trial established Debtor paid a total of more than $40,000.00 to TSB between July 2008 and the petition date. (T.p.121:16-T.p.125:17).

29. Notably, Debtor maintained at trial that all amounts paid by her to TSB were loans and all amount received by her from TSB were repayment of loans. (T.p.125:18-20; p.128:23-25; p.129:1-5). However, Debtor also asserted at trial that the money she used to fund the loans to TSB was either gifted or loaned to Debtor by various family members (T.p.126:8-p129:24); however, no such gifts/loans are reflected on Debtor's Schedules, SOFA, or Form B22A. In fact, the check register – established at trial as the most comprehensive resource reflecting the income and expenses of TSB – does not in any way indicate whether the funds paid by Debtor to TSB were funds loaned or gifted to Debtor by her family. Debtor was unable to explain what she did with the money TSB paid her (T.p.129:25-p.130:24) and could not specify which particular loans were repaid by payments from TSB to Debtor (T.p.132:4-19).

## Conclusions of Law

GBP objects to Debtor's discharge in this case, stating that discharge would be inconsistent with 11 U.S.C. 727(a)(3) and (a)(4). "While objections to discharge should be liberally construed in favor of a debtor, a discharge in bankruptcy is a privilege, not a right, and should only inure to the benefit of the honest debtor." *Menotte v. Hahn (In re Hahn)*, 362 B.R. 542, 546 (Bankr. S.D. Fla. 2007). "By voluntarily choosing to file a chapter 7 bankruptcy petition and seeking the privilege of a discharge . . . the Debtor has a responsibility to provide certain financial information to trustees, creditors and other parties in interest." *CM Temp. Servs. v. Bailey (In re Bailey)*, 375 B.R. 410, 420-421 (Bankr. S.D. Ohio 2007). "Section 727 makes complete financial disclosure a condition precedent to the privilege of discharge." *In re Juzwiak*,

9

89 F.3d 424, 429 (7th Cir. Wis. 1996). In this case, Debtor's financial disclosures are incomplete, inaccurate, and wrought with inconsistencies; therefore, this Court agrees with GBP and for the following reasons, denies Debtor's discharge.

### *TSB's Bank Statements and Check Register Provide Insufficient Record of Debtor's Financial Condition for the Purposes of § 727(a)(3).*

GBP argues that, pursuant to 11 U.S.C. § 727(a)(3), Debtor should be denied a discharge. Section 727(a)(3) states: "the court shall grant a discharge, unless . . . the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers from which the debtor's financial condition or business transactions might be ascertained, unless the act or failure to act was justified under all of the circumstances of the case." To establish a prima facie case under § 727(a)(3), Plaintiff must establish by a preponderance of the evidence that debtor failed to keep or preserve any recorded information and that as a result of such failure, it is impossible to ascertain the financial condition and material business transactions of the debtor. *See Buckeye Ret. Co., LLC v. Bishop (In re Bishop)*, 420 B.R. 841, 849 (Bankr. N.D. Ala. 2009).

While the plain language of § 727(a)(3) does not specify a time period for which the duty to maintain records exists prior to the filing of a bankruptcy petition, "the relevant time period is one that extends a reasonable period in the past so that the debtor's financial history may be ascertained." *Hahn*, 362 B.R. at 547-548 (citing *Meridian Bank v. Alten*, 958 F.2d 1226, 1230 (3d Cir. 1992)). "A reasonable period under section 727(a)(3) varies on a case-by-case basis, but is understood to encompass at least the two year period prior to the filing of the bankruptcy petition." *Hahn*, 362 B.R. at 548; *See Colonial Bank v. Wynn (In re Wynn)*, 261 B.R. 286, 299-300 (Bankr. M.D. Ala. 2001)("The test is whether there [is] available written evidence made and

preserved from which the present financial condition of the bankrupt, and his business transactions for a reasonable period in the past may be ascertained.").

"The Bankruptcy Code does not require a debtor who is seeking a discharge to maintain any specific type of records, nor does it require an impeccable system of bookkeeping." *Wynn*, 261 B.R. at 299-300. "However, the records must sufficiently identify the transactions [so] that intelligent inquiry can be made of them." *Id.* at 300. "Each case must be determined on its own facts" but "The [sic] standard applied to a debtor who is involved in business may be more stringent than the standard imposed on a debtor who is an unsophisticated wage earner." *Menotte v. Davis (In re Davis)*, 363 B.R. 614, 620 (Bankr. M.D. Fla. 2006).

In fact, a debtor's lack of corporate records may constitute the basis for denying a debtor's discharge. *See Bishop*, 420 B.R. at 851. "If a plaintiff is able to show that corporate records are necessary to determine the debtor's financial condition, and the debtor has not kept or preserved such records, the debtor's discharge should be denied pursuant to § 727(a)(3)." *Id.*

Furthermore, it is a Debtor's responsibility to maintain adequate financial records; "the burden is not on the creditor to organize and reconstruct the debtor's business affairs." *In re Juzwiak*, 89 F.3d at 429. "Creditors are not required to sift through documents and attempt to reconstruct the flow of the debtor's assets . . . rather they have a right to be supplied with dependable information on which they can rely in tracing a debtor's financial history." *Id.* (citing, *inter alia*, *In re Hughes*, 873 F.2d 262, 264 (11th Cir. 1989)).

As a preliminary concern, this court concludes Debtor's finances are so closely intertwined with those of TSB that Debtor's record-keeping obligations pursuant to § 727(a)(3), extend to records evidencing the financial condition of TSB. [4] Evidence at trial established significant comingling of funds of TSB, both in the form of direct payments between TSB and

---

[4] *See infra*, pp. 15-19 for additional analysis on this point.

Debtor as well as payments through TSB towards Debtor's individual expenses. Therefore, the financial records of TSB are critical to substantiating Debtor's Schedules, SOFA, and Form B22A – a step necessary to evaluate the zero valuation assigned by Debtor to her ownership of TSB as well as her scheduling of zero income and business expenses, all while employed as "owner of modeling agency."

Within the context of the above-cited authorities and given Debtor's entanglement with TSB, the record established in this case clearly reflects that Debtor's financial records violate the requirements of § 727(a)(3). Debtor testified at trial that she had produced the books and records of TSB to GBP on or before her November 5, 2010 Rule 2004 examination. (T.p.41:10-19). However, Debtor's counsel stipulated during the July 29, 2011 continuation of Debtor's Rule 2004 examination, that the TSB check register had, in fact, not been produced to GBP until a few weeks prior to the July 2011 deposition. (P.E. 17, p.113:25; p.114:1-5; T.p.73:1-12).

The TSB check register combined with the TSB bank statements, which Debtor conceded reflect merely dates and amounts without specifying sources of deposits or payees of funds withdrawn from the account (T.p.44:5-12), together form all of the books and records of Debtor's wholly-owned corporation. (T.p.49:13-25; p.50:1-8). Apart from those records, the only other source of information regarding debtor's financial affairs is Debtor's own recollection; however, throughout her case, Debtor has had tremendous difficulty answering basic question regarding deposits to and withdrawals from TSB's checking account. (T.p.43:1-10; p.46:14-23; p.48:3-6; p.49:2-12; p.50:9-18; p.55:1-22; p.56:12-20; p.60:2-16). Debtor's inability to answer basic questions regarding the financial operation of TSB, coupled with her significant delay in producing the TSB check register, is indicative of the inadequacy of Debtor's

records and the resulting impossibility of ascertaining her financial condition and business transactions.

Debtor's lack of knowledge and records of the financial operation of TSB improperly shifts the burden to GBP to attempt to reconstruct Debtor's financial condition – a burden the law places on Debtor via her voluntary invocation of bankruptcy protection. GBP was thus inappropriately required to conduct exhaustive discovery in the form of supplemental document production and a continuation of Debtor's Rule 2004 examination in an effort to fill in the many blanks resulting from Debtor's insufficient records, recollection, and discovery responses. Accordingly, TSB's bank statements and check register constitute an insufficient record of Debtor's financial condition to satisfy the requirements of § 727(a)(3).

*Debtor's Indication of Zero Monthly Income, Zero Business Expenses, Zero Support Payments or other Form of Income, Coupled with her Zero Valuation of her Ownership Interest in TSB Constitutes a False Oath under § 727(a)(4)(A).*

GBP also argues that pursuant to 11 U.S.C. § 727(a)(4)(A), Debtor should be denied a discharge. Section 727(a)(4)(A) states, in pertinent part: "the court shall grant a discharge, unless . . . (4) the debtor knowingly and fraudulently, in or in connection with the case – (A) made a false oath or account." To establish a prima facie case under § 727(a)(4)(A), Plaintiff must "prove by the preponderance of evidence that (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with the intent to deceive; and (5) the statement related materially to the bankruptcy case." *Neary v. Mosher (In re Mosher)*, 417 B.R. 772, 781 (Bankr. N.D. Ill. 2009). "For purposes of § 727(a)(4), a debtor's petition and schedules, statement of financial affairs, statements made at a § 341 meeting and testimony at a Rule 2004 examination all constitute statements that are made under oath." *Id.*

A particular false oath need not be established as detrimental to a creditor in order to be considered material; rather, materiality of the false oath instead turns upon whether the statement bears a relationship to debtor's business transactions or bankruptcy estate, or concerns discovery of assets, business dealings, or the existence or disposition of his or her property. *In re Chalik*, 748 F.2d 616, 618 (11th Cir. Fla. 1984). Accordingly, a debtor may not defend against a § 727(a)(4)(A) claim merely by asserting that the false oath pertained to a worthless asset – intent to injure creditors is not required to sustain the objection. *Id.; Williamson Constr. v. Ross (In re Ross)*, 217 B.R. 319, 324 (Bankr. M.D. Fla. 1998)( ". . . debtor cannot circumvent § 727(a)(4)(A) by claiming that the omission concerns an item of zero or minimal value.").

An objecting creditor must, however, prove a debtor's "intent to deceive." *See Mosher*, 417 B.R. at 781. "It is well established that because direct evidence of fraudulent intent is rarely available, the requisite intent under Section 727(a)(4)(A) may be inferred from circumstantial evidence or by inferences based on an entire course of conduct." *Id.* "Intent to deceive also includes behavior that is so reckless as to justify the finding of fraud. For example, a debtor's awareness of an omitted asset but failure to list it in the debtor's bankruptcy schedules and statements can indicate that the debtor is recklessly indifferent to the truth." *Id.; see also Bennett v. Hollingsworth (In re Hollingsworth)*, 224 B.R. 822, 830 (Bankr. M.D. Fla. 1998)("An inference of knowing and fraudulent intent can be drawn from circumstances surrounding and observations of the debtor.").

"The cumulative effect of a number of false oaths by the debtor with respect to a variety of matters can establish a pattern of reckless and cavalier disregard for the truth by the debtor." *Mosher*, 417 B.R. at 781; *Casey v. Kasal (In re Kasal)*, 217 B.R. 727, 739 (Bankr. E.D. Pa. 1998)("pervasive and immense errors, all to the Debtor's benefit, clearly support that the

14

violations were knowing and fraudulent."); *see also Youngblood v. Hembree (In re Hembree)*, 186 B.R. 530, 532 (Bankr. M.D. Fla. 1995)("reckless disregard for the truth is generally recognized as the equivalent to fraudulent intent"). Further, an omission the debtor knows will create an erroneous impression "amounts to the same thing as a material misrepresentation." *Mosher*, 417 B.R. at 781-82; *see also Hollingsworth*, 224 B.R. at 830 ("A knowing and fraudulent omission from a debtor's schedules can constitute a false oath.").

In this case, GBP focuses primarily on the assertions in Debtor's Schedules, SOFA, and Form B22A; specifically, Debtor's assertions that she receives zero monthly income and spends nothing towards the business expenses of TSB along with her zero valuation for her ownership interest therein. *See Benchmark Bank v. Crumley (In re Crumley)*, 428 B.R. 349, 362-363 (Bankr. N.D. Tex. 2010)( "As with income, omissions or misstatements of expenses are material because of their direct relationship to the disposition of the debtor's property."). Evidence at trial established substantial sums of money flowing between Debtor and TSB in the two-year period preceding the petition date (T.p.80-p.100:1-2; p.100:3-p.119:16; p.121:16-p125:17). These sums included both direct payments between Debtor and TSB, as well as payments by TSB towards expenses that were individual to Debtor.

Under factual circumstances similar to those at issue here, courts from around the country have uniformly determined that a failure to schedule such transfers between a debtor and the debtor's corporate entity constitutes a false oath. *See e.g.*, *EPIC Aviation, LLC v. Phillips (In re Phillips)*, 418 B.R. 445, 462-463 (Bankr. M.D. Fla. 2009)("Plaintiff established the existence of numerous substantial transfers between the Debtor and various corporations controlled by the Debtor . . . While [Debtor] may warrant the title entrepreneur, that title does not shield him from the obligation to disclose large sums of money flowing in and out of his accounts"); *Kasal*, 217

15

B.R. at 735 ("Thus, describing his 'interests' in the Business as worth "0" was false and grossly misleading."); *Mosher*, 417 B.R. at 780 (". . . assets of a purportedly separate entity can be treated as assets of the estate, including for purposes of Sections 727(a)(4)(A) and 727(a)(3), where the entity is merely the alter ego of the debtor.").

Debtor's characterization at trial of her payments to TSB as "loans" and of payments from TSB to Debtor as "loan repayments" is unavailing for purposes of § 727(a)(4)(A) – such distributions should have been disclosed on Debtor's Schedules, SOFA, and Form B22A. *Mosher*, 417 B.R. at 785 (explaining debtor's scheduling of "neither the assets nor his right to payment from [Debtor's wholly-owned corporate entity] indicates a knowing intent to conceal the income and assets."). Even if the Court were to accept Debtor's testimony that such "loans" were funded by family gifts, Debtor's failure to schedule those gifts was itself a false oath. *See Crumley*, 428 B.R. at 361 (explaining that failure to disclose a series of payments characterized as "loans or gifts from friends" constitutes a material omission). Additionally, all payments made by TSB towards Debtor's individual expenses must also be viewed as income and should have been indicated on Debtor's Schedules, SOFA, and Form B22A. *See Patchett v. Marsh (In re Marsh)*, 377 B.R. 749, 753-754 (Bankr. S.D. Fla. 2007); *Hembree*, 186 B.R. at 533.

Debtor operates TSB as a corporation; corporations ordinarily enjoy a legal identity distinct from the debtor individually, as a matter of state law. That fact is, however, irrelevant under the circumstances of this adversary proceeding. Evidence introduced at trial established that funds were transferred back and forth, between Debtor and TSB. These transfers should have been reflected on Debtor's Schedules, SOFA, and Form B22A – this is true regardless of whether TSB is viewed as a legal entity separate from Debtor individually or not.

Additionally, GBP argued at trial that TSB was Debtor's alter ego as a result of Debtor's comingling of personal assets with those of the corporation. Courts that have considered the issue within the context of § 727(a)(4)(A) have concluded that it is appropriate to disregard the legal existence of a debtor's corporate entity where the debtor has failed to maintain corporate formalities, comingled personal and corporate funds, or otherwise sought to utilize the corporate form so as to evade individual financial obligations. *Mosher*, 417 B.R. at 780 ("Moreover, even if the entity were still to be treated as in existence . . . it would be proper to disregard the corporate entity and look through to the Debtor using the theory of alter ego or reverse veil-piercing, based on the way the Debtor used the entity."); *Blomberg v. Riley (In re Riley)*, 351 B.R. 662, 671 (Bankr. E.D. Wis. 2006)("When one legal entity is but an instrumentality or alter ego of another, by which it is dominated, a court may look beyond form to substance and may disregard the theory of distinct legal entities in determining ownership of assets in a bankruptcy proceeding."); *In re Albright*, 291 B.R. 538, 539 (Bankr. D. Colo. 2003)(debtor's wholly-owned LLC became property of the individual bankruptcy estate, the assets of which were available to the trustee for liquidation purposes).

Under the facts of this case, it is appropriate for this Court to disregard TSB's corporate form due to Debtor's frequent comingling of personal funds with those of the corporation. Moreover, Debtor cannot reasonably argue for a distinction between her assets and the assets of TSB because she ignored any such distinction by including monthly expenses on Debtor's Schedule J that were in fact paid regularly by TSB.

Further, Debtor put the finances of TSB at issue in this case by scheduling a "0" valuation for her ownership interest in TSB. This valuation necessarily requires an analysis of the corporation's financial condition to substantiate Debtor's assertion that the entity has no

17

value whatsoever; in particular, when, as Debtor conceded at trial, she is entitled to retain any funds earned through TSB to the extent the corporation's income exceeds its expenses. *See In re Schwab*, 378 B.R. 854, 857-858 (Bankr. D. Minn. 2007)(accounts receivable of wholly-owned LLC belong to an individual debtor to the extent the LLC has no liabilities). If Debtor is entitled to retain a portion of TSB's income, her ownership interest in the corporation must be worth more than zero.

Several courts have considered the issue and concluded that assets of a debtor's closely-held corporate entity become assets of the debtor's individual bankruptcy estate. *See e.g.*, *Smith v. Friskney (In re Friskney)*, 282 B.R. 250, 253 (Bankr. M.D. Fla. 2002)(citing *In re Hill*, 265 B.R. 296, 300 (Bankr. M.D. Fla. 2001)); *see also Schieffler v. Coleman (In re Beshears)*, 196 B.R. 464, 467 (Bankr. E.D. Ark. 1996)("Although the mere form was a transfer by the corporation, the substance was a transfer of the entire value of the asset, depriving the bankruptcy estate of that valuable asset."). Additionally, the evidence adduced at trial in this case establishes that TSB is a subchapter S corporation for the purposes of income taxes (as reflected in TSB's tax returns, admitted to evidence as P.E. 2). As a result, the income of TSB is legally treated as the income of TSB's sole shareholder. *See Alleman v. Kitson (In re Kitson)*, 341 Fed. Appx. 234, 237 (7th Cir. Ill. 2009)(explaining that corporate income earned by a Subchapter S corporation owned by a bankruptcy petitioner must be disclosed); *In re Sandifer*, 448 B.R. 382, 385-386 (Bankr. D.S.C. 2011); *see also In re Schafroth*, 81 B.R. 509, 512 (Bankr. S.D. Iowa 1987)("The corporation's income would be attributable to the debtors if [debtor's corporation] were a subchapter S corporation.").

Scheduling the assets and liabilities of an individual debtor's wholly-owned entity promotes full disclosure and judicial economy, *See In re Mikulasik*, 380 B.R. 499 (Bankr. N.D.

Ohio 2008), constitutes good practice, *See BTE Concrete Formwork, LLC v. Arbaney (In re Arbaney)*, 345 B.R. 293, 310 (Bankr. D. Colo. 2006)("The Court believes that it is good practice for the assets of a debtor's solely owned corporation . . . to appear on that debtor's individual bankruptcy schedules."), and various courts have concluded that such disclosure is required, *See Neary v. Stamat (In re Stamat)*, 395 B.R. 59, 71 (Bankr. N.D. Ill. 2008)("Defendants' characterization of a limited liability company as a separate legal entity is a correct statement of state corporate law for purposes of liability, but is irrelevant for purposes of federal taxation and determining gross income.").

There is simply no reasonable basis to conclude that Debtor was unaware of the falsity of her schedules in connection with her ownership and operation of TSB. Debtor was spending money to keep TSB operating and receiving payments from both TSB and various family members on a monthly basis during the years leading up to her bankruptcy filing. Therefore, circumstantial evidence proves Debtor's indication of zero monthly income, zero business expenses, zero support payments or other form of income coupled with her zero valuation of her ownership interest in TSB, were statements Debtor made under oath and with knowledge of their falsity.

Having has an opportunity to observe Debtor's demeanor at trial, this Court must also conclude Debtor completed her Schedules, SOFA, and Form B22A with the intent to deceive the Court, the trustee, and creditors of the bankruptcy estate. Specifically, Debtor testified that she has "not received a check or a payment from [TSB] in years," (T.p.37:7-13), and that she "didn't receive a dime" of TSB's gross income (T.p.38:3-10) – these assertions were directly contradicted by TSB's check register (P.E. 7), which reflects payments to and from Debtor out of TSB's operating account on a monthly basis throughout the two-year period before her

Case 11-01665-JKO    Doc 37    Filed 11/22/11    Page 20 of 21

bankruptcy filing. It is highly improbable that a person who has owned and operated a closely-held corporation for well over a decade is completely unaware of the financial condition of that entity. It is also unlikely that such a person would be innocently unaware of payments regularly received from and amounts regularly paid to that entity.

In light of the above-referenced authorities, this Court concludes that Debtor's omission of income received from TSB, omission of funds spent towards the expenses of TSB, failure to assign an appropriate valuation to her ownership interest in TSB, and failure to indicate the financial assistance received from various family members on Debtor's Schedules, SOFA, and Form B22A constitute false oaths under § 727(a)(4)(A).

### *Attorneys' Fees*

At trial and in the absence of an objection from Debtor, this Court permitted GBP to amend its adversary complaint so as to assert GBP's entitlement to prevailing party attorneys' fees pursuant to GBP's Independent Contractor Agreement with Debtor ("Contract," admitted to evidence as P.E. 18). The relevant portion of the Contract reads as follows:

"Dispute Resolution: . . . In any litigation between Broker [*i.e.*, Debtor], the prevailing party will be entitled to recover reasonable attorneys' fees and costs at all levels . . ."

This court hereby finds that GBP is the prevailing party in this litigation, which pertains to a debt arising from a final judgment entered in county court litigation between the parties. *See* Amended Complaint Objecting to Discharge, [ECF No. 27-1]; Answer, [ECF No. 20]; Debtor's response to SOFA Question 4 (P.E. 14). Accordingly, this Court awards GBP entitlement to prevailing party attorney fees and costs based upon the broad provision in the Contract with Debtor, which contemplate recovery of fees "at all levels" in "any" litigation between the parties.

20

This Court reserves jurisdiction to determine a reasonable amount of fees and costs upon notice
and a hearing to be scheduled later.

The above constitutes this Court's findings of fact and conclusions of law pursuant to
Fed. R. Bankr. P. 7052. For the reasons stated, Debtor's discharge shall be denied via a separate
Final Judgment. Attorney Steve Bimston is directed to submit a proposed Final Judgment within
seven days and any motion for attorneys' fees and costs must be filed within fourteen days.

###

*The Clerk of Court is directed to provide copies of these Findings of Fact and
Conclusions of Law to all interested parties registered to receive notice.*